## Thomas Crawshaw v. H. C. Curtis, et al.

1. PUBLIC GRIST MILL—*what not a.* A mill which was never held out to the public as one where persons could get grain ground by the grist and for toll and which was neither intended nor equipped to be operated in that way, is not a public grist mill within the meaning of the statute.

Action of debt to recover penalty. Appeal from the Circuit Court of Jackson County; the Hon. W. W. DUNCAN, Judge, presiding. Heard in this court at the August term, 1904. Affirmed. Opinion filed March 17, 1905.

YOUNGBLOOD & BARR, for appellant.

WILLIAM A. SCHWARTZ and HOSEA V. FERRELL, for appellees.

MR. PRESIDING JUSTICE HIGBEE delivered the opinion of the court.

This was a suit brought by appellant against appellees to recover a penalty under the statute relating to Mills and Millers for taking too much toll. Section 6 of said statute so far as it applies to this action reads: "The owner or occupier of every public grist mill within this state shall grind the grain brought to his mill as well as the nature and condition of his mill will permit, and in due turn as the same shall be brought, and may take for the toll, if a water mill or steam mill, for grinding and bolting wheat, rye or other grain, one-eighth part." Section 7 provides, that "for a failure to perform any of the duties required by this act, every occupier of a public mill shall forfeit and pay the sum of $5.00 to the use of any person who shall sue for the same." Section 9 provides "if any miller or occupier of any mill shall take a greater proportionate quantity of toll than is allowed by this act or shall not sufficiently grind or grind and bolt (as the case may be), agreeably to the capacity of his mill and in due turn as the same may have been brought, all grain received into such mill for the purpose of being ground or ground and

Crawshaw v. Curtis.

bolted, as directed by the owner, every miller or occupier of a public mill so offending, shall forfeit and pay the sum of $5.00 to the party injured."

Appellees are the owners of a steam flouring mill, located in the city of Carbondale, Illinois. It is patronized by the public generally and all its patrons are treated in the same way. It does not grind each man's grain in turn as the same is brought to the mill, but when a person brings grain to the mill and desires flour and bran in exchange therefor, the wheat is weighed and the patron is delivered a certain amount of flour and bran in exchange. When the wheat is brought to the mill it is unloaded into a big hopper and from there goes into a sink and from thence into a separator, which cleans it, and then to the rollers. The mill manufactures three grades of flour, and from 13 to 15 grades of other product out of wheat. If the mill were empty it would take from 50 to 75 bushels of wheat to start it so as to make flour. On February 21, 1903, appellant brought to the mill 520 pounds of good merchantable wheat, and the manager of the mill, appellee Curtis, gave him in exchange for it 286 pounds of flour and 86 pounds of bran. Sometime before this appellant and Mr. Curtis had had a conversation in regard to the matter, in which appellant insisted he should have more flour for a bushel of wheat and Curtis said he could not possibly give more than he was giving. No demand was made by appellant on said day that the mill grind his wheat, and there was no conversation between the parties in regard to the toll. After the wheat was weighed and the flour and bran delivered, appellant asked for and received a statement of the weights. On March 3, 1903, appellant again went to the mill, taking six bushels and ten pounds, or 370 pounds, of wheat for which he received 205½ pounds of flour and 60 pounds of bran, and on that occasion there was no demand that the wheat be ground and no conversation concerning the toll. On the trial appellee Curtis testified that the mill was owned by private individuals and the property was not obtained by condemnation proceedings; that appellees were

not running a toll mill and had never run a toll mill at Carbondale; that they were accustomed to exchange flour and bran for wheat or pay money for it, whichever the seller wished; that the exchange business was a kind of "side issue;" that they never ground for a party bringing wheat the identical wheat which he brought and delivered to him the product thereof in flour and bran; that they did not grind the grist of appellant but took his wheat and gave him flour and bran in exchange for it; that it would have been impossible with the mill they had, to have ground the small amount of wheat which appellant brought to the mill and give him in return the flour and bran which his wheat produced; that the machinery was not so constructed as to enable them to grind that amount of wheat alone.

This suit was instituted before a justice of the peace and afterwards taken by appeal to the Circuit Court where a jury was waived, the court found in favor of appellees and gave judgment against appellant for costs.

The question presented to us is, whether the mill owned and operated by appellees is a public grist mill, within the meaning of the statute above referred to. While the act referred to has been before our Supreme Court several times, this precise question was not raised in these cases and that court has not defined what it takes to constitute a public grist mill under the law in this state. Appellees claim that there is a difference between what they call the "old time public mill or public grist mill" and the modern merchant mill, and that the statute applies to the former class, while the mill in question belongs to the latter class. Among the definitions of grist given by the Century Dictionary are "Grain carried to the mill to be ground separately for its owner," "Grain carried to the mill for grinding at one time." And it defines grist mill as "A mill for grinding grain by the grist or for customers." Webster defines grist mill as a "mill for grinding grain, especially a mill for grinding grists or portions of grain brought by different customers."

In determining what was meant by the legislature by the

Crawshaw v. Curtis.

term "public grist mill," it is helpful to consider the history of mills engaged in grinding grain in this state as shown by the proofs in this case and such legislation as there was governing them, together with the several sections of the present law upon the subject.

The witness Peter Brown testified that he came to Illinois in 1856 and lived in Carbondale; that when he came to 'that part of the country they were using water mills and horse mills but no steam mills; that there were two different water mills, one in Johnson county and .one in Williamson county; that he went to the mill on horse back and the rule was, first come first served; that the miller would measure up the grain, put it in the hopper, then take his toll, which was one eight of the grain, in his toll dish, and the balance of the grain was ground for the owner, who put the ground product in his sack and took it away; that the toll was taken out of the hopper just as soon as the grain was measured into it; that the mills were so constructed that each man got the product of his own grain and were just costly enough to require the attention of one man; that the wheat was not fanned at the mill but that if a person took dirty wheat he would get dirty flour; that such mills did not exchange flour for wheat but that each man got his own grist ground; that they ground for the public and for toll and were called public mills.

Appellee Curtis testified that he had seen what he called public grist mills; that when a farmer took his grist to such a mill the miller would measure the grain, take out his one eight toll and grind the rest just as it was brought to the mill; that the toll was taken out before the grain was ground; that no effort was made to clean the wheat and it was ground just as it was brought in; that a bushel or any amount of wheat would start the mill.

Laws were passed at an early date in this state, governing the operations of mills engaged in grinding grain for the public, and the statute of 1869 provided as follows: "All mills now in operation or which may hereafter be put in operation in this state, for grinding wheat, rye, corn or

other grain and which shall grind for toll, shall be deemed public mills." It would thus appear that the act made it an essential requisite of a public mill that it should grind for toll and the toll fixed for grinding and bolting wheat brought to the mill, was ⅛ part thereof. The definition above given was left out of the act of 1872, which was carried into the revision of 1874 and is the one now under consideration, but the provisions of the present act show indications of having been intended to apply to just such mills. The present act also contains language which apparently applies with peculiar force to mills resembling in their extent and capacity, the grist mills of earlier times described by the above witnesses. For instance, it provides that the operator of a public grist mill shall grind the grain brought to his mill as well as the nature and condition of his mill will permit and in due turn as the same shall be brought; that the operator of the mill must be punctual in his attendance, when his mill is not out of repair and aid and assist in loading and unloading all grain which shall be brought to him to be ground; that he shall keep an accurate half bushel measure and an accurate set of toll dishes or scales for weighing the grain. Rev. Stat. chap. 90, secs. 6 and 7. Such provisions could not possibly be intended to apply to the great merchant flouring mills of the present day with their immense products, but must have been intended to apply to mills which grind grists for persons for toll and which in that respect as well as others, must resemble the old-fashioned grist mills above described.

Appellees' mill ground from 500 to 600 bushels of wheat a day and did not take toll out of grain brought to be ground nor out of the finished product. It would have been manifestly impossible for the operator of the mill to have personally aided and assisted in loading and unloading all the grain brought to him to be ground. He could not have ground the grain of the persons who brought it there in due turn as the same was brought to the mill, without seriously interfering with the operation of the mill. This would

have required him to stop all other work of the mill when a person brought wheat to be ground, while he weighed the wheat, took out his toll and caused the grain to be ground. It would have also required him to deliver to the owner the three grades of flour manufactured by the mill, together with the numerous other products of such wheat. Moreover appellees' mill was so arranged that it could not have taken the small amounts of wheat delivered to it by appellant at the times mentioned, and ground them alone, as it required from 50 to 75 bushels of wheat to start the mill. In fact appellant did not demand of appellees' mill the services of a public grist mill under the statute, as he did not request to have his wheat ground and expressed no desire to have the product thereof. His complaint was that he did not receive enough flour and bran in exchange for his wheat. The whole course of the business conducted by appellees at their mill, shows that they did not take toll for grinding wheat for any one, and in fact that they did not grind wheat for other persons, either for toll in grain or for money, but that they bought wheat and ground it on their own account; that in buying wheat they would pay the party bringing it to them, either money or flour as the seller desired. The transaction between appellant and appellees did not appear to be concerned with the grinding of appellant's wheat but with the price he was to get for it in flour and could have taken place between the parties in the same way if appellees had no mill but were simply grain and flour merchants and paid for wheat brought them either in money or flour at the option of the seller. The proofs showed the mill was never held out to the public as one where persons could get grain ground by the grist and for toll and that it was neither intended nor equipped to be operated in that way.

We are therefore of the opinion that appellees' mill was not a public grist mill within the meaning of the statute.

Appellant relies very largely upon the case of State of Maine v. Edwards et al., 25 L. R. A. 504 (86 Maine 102). In that case the defendants were convicted under a Maine

statute, of refusing to receive grain at their grist mill when tendered to be ground and of taking excessive toll. The defendants excepted to the ruling of the court below, that they were bound to receive the grists of grain offered and grind the same for the toll specified by the statute and that an agreement for toll in excess of that fixed by the statute would be no defense. The opinion stated in substance, that the case did not show what kind of a mill they operated, whether public or private or the motive power, but assumed that it was a grist mill used for grinding grain for the public; that exceptions must show sufficient facts, to make the ruling thereon erroneous; that as defendants had failed to produce facts showing the kind of mill operated, the judgment must be entered on the verdict, if the statute under which the conviction was had was constitutional, when applied to any kind of a grist mill; that it might "be assumed that defendants' mill was a public grist mill propelled by a head of water, obtained under authority of the mill act." That is, by reason of the failure of the defendants to show what kind of a mill the defendants were operating the court assumed that they were operating the kind of a mill named by the statute and thereupon proceeded to hold the statute constitutional and sustain the conviction of the defendants under it. The principles laid down in that case do not affect the case at bar for the reason that in the Maine case it was assumed that the mill referred to was a public grist mill in the absence of proof on the subject, while in this case that is the very question raised upon the proofs; and it is essential to be noted that in the Maine case the assumption was that the mill was not only a public grist mill, but was propelled by a head of water obtained under authority of the mill act, while in the case before us the. mill property was obtained by purchase without the exercise of the right of eminent domain.

The judgment of the court below will be affirmed.

*Affirmed.*